## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MOSS HOLDING COMPANY,

Plaintiff,

v.

CULLEN FULLER, DANIEL
SCANDIFF, and IMAGE OPTIONS,
INC.,

Defendants.

Case No. 20-cv-01043

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Moss Holding Company brings this action alleging trade secret
misappropriation against Defendants Image Options, Inc., Cullen Fuller, and Daniel
Scandiff. In its eleven-count Amended Complaint, Moss alleges trade secret
misappropriation under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1)
and Illinois Trade Secrets Act, 765 ILCS § 1065 as well as state law claims for breach
of a confidentiality agreement, breach of fiduciary duty, and inducement to breach
duty of loyalty. Moss moved for a temporary restraining order (TRO), preliminary
injunction and expedited discovery. The Court heard oral argument on February 21,
2020, and both Image Options and Individual Defendants filed response briefs (Dkts.
Dkts. 31, 36).

For the reasons stated below, Moss's motion for TRO and preliminary injunction
[2] is granted in part and denied in part. In light of this order, Moss' motion for
expedited discovery is [3] denied.

1

## STANDARD

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). The party seeking a preliminary injunction must make an initial threshold showing that: (1) it has some likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; and (3) there is no adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079 (7th Cir. 2008). If the moving party makes this initial showing, the court then balances the irreparable harm that the moving party would endure without a preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Id.* at 1086. "This Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal citations and quotations omitted). Courts in this Circuit apply the same standards for granting a temporary restraining order and preliminary injunction. *See Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013).

## BACKGROUND

These facts are taken from Moss's Verified Complaint (Dkt. 13), declarations attached to Moss's brief in support of its TRO and preliminary injunction motion (Dkt. 5), the declaration attached to Image Option's response brief (Dkt. 31), and the

declarations attached to the Individual Defendants' response brief (Dkt. 36).[1] The Court makes "factual determinations on the basis of a fair interpretation of the evidence before the court." *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). However, these findings are preliminary and "do not bind the district court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).[2]

This case involves two former Moss employees, Cullen Fuller and Daniel Scandiff, and a Moss competitor, Image Options. Moss is a leading provider of custom fabricated items and custom décor elements for a variety of retail, architectural firms, retail design firms, exhibit houses, and similar industries. (Amended Verified Complaint, Dkt. 13 ("Am. Compl.") ¶6). Moss is based in Illinois and Image Options is based in California. (*Id*. ¶¶1, 5). Moss alleges that Fuller and Scandiff were two of its four most senior sales employees who worked for the company from April 2014 until Jan. 7, 2020, when they were terminated. (Am. Compl. ¶¶14, 19; Patterson Aff. ¶3). At the time of their termination, Fuller and Scandiff were responsible for developing and cultivating some of Moss's largest clients. (Patterson Aff. ¶4).

---

[1] Daniel Patterson is Moss's President and Chief Executive Officer and has served in that capacity since April 2014. (Patterson Aff. (Dkt. 5-1)). Robin Jimerson is Vice-President of Sales for Retail and Environments at Moss and has been in that role since July 8, 2019. (Jimerson Aff. (Dkt. 5-2)). David Bales is CEO of Image Options. (Bales Aff. (Dkt. 31-1)). Fuller's and Scandiff's Affidavits are attached to their opposition to the TRO and preliminary injunction. (Dkt. 36).

[2] "Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

Moss has two main components to its business: the retail side and the corporate or environmental side. (Jimerson Aff. ¶¶3–4). Scandiff developed retail client relationships and Fuller focused on corporate environments clients. (*Id*. ¶7). Moss's client relationships are long-term and repeat in nature. (Am. Compl. ¶9). Moss provides clients with integrated services, normally dependent on strong supplier relationships, to meet clients' unique project needs in the retail and corporate environments space. (*Id*. ¶11; Patterson Aff. ¶4). Image Options provides similar services to the same type of clients as Moss (Am. Compl. ¶35).

Moss hired Fuller and Scandiff on April 1, 2014 when both were employees of Andres Imaging & Graphics, Inc., a company Moss acquired. (*Id*. ¶14). On April 8 and April 10, 2014, respectively, Scandiff and Fuller signed Moss's Confidentiality and Non-Disclosure Agreement (the "Confidentiality Agreement") as a condition of their employment. (*Id*. ¶¶15–17). Under the Confidentiality Agreement, Fuller and Scandiff agreed not to, during the term of their employment or any time thereafter:

> divulge, use, furnish, disclose, or make accessible to anyone other than Moss Inc., or other than in Moss Inc.'s usual course of business, any knowledge or information with respect to:
>
> 1. Confidential or secret processes, plans, formulae, designs, programs, devices or material relating to the business, services, or activities of Moss, Inc.;
> 2. Any confidential or secret development or other original work of Moss Inc., or
> 3. Any other confidential or secret aspect of the business, product, or activities of Moss Inc.

(*Id*. ¶18; Exhs. A, B). The Confidentiality Agreement further states that "[a]ll records, materials, and information obtained by the Employee in the course of his or

her employment are confidential and shall remain the exclusive property of Moss Inc.", and "[e]mployee acknowledges and agrees that any unauthorized disclosure or use of information described above, whether during or after Employee's term of employment with Moss Inc., will damage, diminish, and irreparably harm Moss Inc. such that there will not be an adequate remedy at law." (*Id.*, Exhs. A, B). In addition to its Confidentiality Agreement, Moss's Employee Handbook states: "The protection of confidential business information and trade secrets is vital to the interests and success of Moss." (*Id.* ¶25; Exh. C). It lists such confidential information as including, but not limited to, "financial information", "marketing strategies," and pending projects and proposals. (*Id.*).

On July 13, 2019, the Chairman of Image Options, Tim Bennett ("Bennett"), contacted Scandiff through a direct LinkedIn message. (*Id.* ¶37). Moss believes Scandiff met with Image Options around the time of the message. (*Id.* ¶40). On January 6, 2020, Moss learned that Fuller and Scandiff had been communicating with Image Options from the end of August 2019 through October 1, 2019, about clients, client projects, projected client revenues and production requirements, and plans to open an Image Options location in Chicago in direct competition with Moss. (*Id.* ¶43–44). On August 30, Image Options' Chief Executive Officer, David Bales ("Bales"), told Scandiff to "put together a spreadsheet that we use to help evaluate opportunities such as the one we are discussing…The more comprehensive the information we get the better." (*Id.* ¶49). On September 9, Scandiff responded to Bales, providing "attached excel files for [Fuller] and myself" which included

information about Moss clients that Scandiff and Fuller had developed as Moss Senior Account Executives ("Moss Client Spreadsheets") (*Id*. ¶¶52, 67). Jimerson summarizes the information in the Moss Client Spreadsheets as follows:

> The information that Fuller and Scandiff sent to Image Options in a spreadsheet looks like a compilation of Moss internal client information specific to clients they were responsible for developing. The spreadsheets are not Moss documents but appear to be data collected from Moss. The spreadsheets discuss client names, prior year's revenue (2018), anticipated current year's revenue (2019), sales category (e.g., retail or environments), and other selling details. Those details include the type of print process and type of fabrication needed for manufacture or production. In some cases, the spreadsheet contains specific comments about the status of client projects.

(Jimerson Aff. ¶23). On October 1, Bales responded to Scandiff, copying Bennett, in a way that, Moss alleges, shows Image Options seeking to replicate Moss's business in Chicago and to divert Moss clients to itself. (Am. Compl. ¶59). The October 1 email asked about specific clients and questions such as whether certain materials "can all be produced remotely" and "Can you estimate the % of 2019 business you believe you could move with you for 2020, and how it would ramp up? Please get same info from Cullen." (*Id*., Exh. E).

After learning about the correspondence between Image Options and Fuller and Scandiff, Moss terminated Fuller and Scandiff immediately on January 7, 2020. (*Id*. ¶64). After Moss's counsel contacted Image Options, Image Options returned the Moss Client Spreadsheets. (*Id*. ¶66). Moss later found additional emails stored on Fuller's Moss email account that he also forwarded to his personal Gmail account, while still employed at Moss, including emails containing non-public client and supplier contact information and discussions about ongoing projects. (*Id*. ¶¶81–85).

According to Bales, Fuller and Scandiff are not currently, and have never been, employees of Image Options and have no contractual agreement with Image Options. (Bales Aff. ¶4). Also according to Bales, Scandiff reached out to Bennett around June 26 or 27, 2019 and explained that he and a work colleague were looking for new employment opportunities. (*Id*. ¶5). On August 28, 2019, Scandiff visited the Image Options corporate office in California where Bales and Scandiff discussed possible employment opportunities. (*Id*. ¶6). Scandiff advised Bales that neither he nor Fuller had signed any agreements with Moss that would prevent them from becoming employed at Image Options including either a non-compete or non-solicitation agreement. (*Id*.). Bales explains that on August 30, 2019, he "sent an email to Scandiff requesting information from Fuller and him to help Image Options evaluate the opportunity of opening a Chicago office with them employed there. I provided a spreadsheet template to him to help understand an estimate of their respective books of business." (*Id*. ¶7). Bales says he has done the same thing with other potential hires "to evaluate potential portable business." (*Id*.).

On September 9, 2019, Scandiff submitted "two completed spreadsheets on behalf of Fuller and himself, which included potential clients and various projections and estimates." (*Id*. ¶8). Bales states that the reason he requested the information was to determine that "there were no conflicts or cross over of accounts with current clients already working with Image Options" and whether "hiring Fuller and Scandiff was economically worthwhile." (*Id*. ¶9). On October 1, 2019, Image Options requested "follow-up/ clarifying information from Scandiff and Fuller" from the September 9

correspondence. (*Id*. ¶15). On October 9, Bales spoke with both Scandiff and Fuller about opening an Image Options Chicago office and their respective books of business. (*Id*. ¶16). After Moss submitted a letter of intent to Image Options regarding possible acquisition of Image Options, Bales told Scandiff and Fuller that the hiring process was on hold (though he was keeping the discussions with Moss confidential). (*Id*. ¶18).

At the end of November 2019, after Image Options decided to proceed with a different entity, Image Options re-started conversations with Scandiff and Fuller about opening the Chicago Office. (*Id*. ¶19). Scandiff and Fuller visited Image Options' corporate office on December 16, 2019. (*Id*. ¶20). Image Options received "a suggested business plan on how to structure the Chicago office from Scandiff and Fuller on December 27, 2019" though Bales says that nothing in the business plan included any Moss information, confidential or otherwise. (*Id*. ¶21). In response to Moss's outside counsel contacting Image Options, Image Options assured Moss's counsel that it was not employing or retaining Scandiff or Fuller and returned the spreadsheets that Fuller and Scandiff had provided. (*Id*. ¶23).

In his affidavit, Scandiff explains that Moss provides bids in response potential customers' advertisements for bids on a project by project basis. (Scandiff Aff. ¶6). Scandiff states that Moss did not have an exclusive agreement with any of the customers referenced in its complaint, and Moss and its competitors use the same suppliers and subcontractors. (*Id*. ¶¶7, 9). He also confirms that the only agreement he ever signed was the Confidentiality Agreement. (*Id*. ¶14). Scandiff asserts that neither the Confidentiality Agreement nor the Moss Employee Handbook mention

the words "client" or "customer." (*Id*.). He further states that at the time he was inserting his estimates of Moss' revenues into the spreadsheets, Moss was using "Salesforce" and "File Maker", though he did not know how to use File Maker. (*Id*. ¶27). As for the information he inserted into the spreadsheet, he says he did not review any Moss data to obtain that information instead, "the customer identities are known throughout the industry and I only made estimates of revenue off the top of my head." (*Id*. ¶28).

On January 8, 2020, both Scandiff and Fuller received the Cease and Desist Letter from Moss's outside counsel. (*Id*. ¶39; Fuller Aff. ¶31). Like Scandiff, Fuller says the only agreement he ever signed was the Confidentiality Agreement. (Fuller Aff. ¶14). Fuller similarly explains that at the time he was inserting his estimates of Moss' revenues into the spreadsheets, Moss was using "Salesforce" and "File Maker", though he did not know how to use File Maker. (*Id*. ¶28). As for the information he inserted into the spreadsheet, Fuller says he did not review any Moss data to obtain that information instead, "the customer identities are known throughout the industry and I only made estimates of revenue off the top of my head." (*Id*. ¶29).

## ANALYSIS

Moss asks the Court to enjoin the Defendants from using Moss's confidential information, soliciting or servicing its clients and suppliers, and working together to compete with Moss. Moss's motion will be granted in part.

## A. Likelihood of Success on the Merits

A party moving for a preliminary injunction "must only show that [its] chances to succeed on [its] claims are better than negligible. This is a low threshold." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (internal quotations and citations omitted).[3] Moss argues that it is likely to succeed all of its claims. (Dkt. 5 at 3–8).[4]

### 1. Trade Secret Misappropriation

For its misappropriation claims, Moss must "demonstrate that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Aon Risk Servs. Cos. v. Alliant Ins. Servs.*, 2019 U.S. Dist. LEXIS 204402, at *6 (N.D. Ill. Nov. 25, 2019) (internal quotations and citations omitted). "Because the pertinent definitions of the [ITSA and DTSA] overlap, the Court analyzes the likelihood of success of the two claims together." *Id.*

---

[3] Image Options argues that the Seventh Circuit has "abandoned the 'better than negligible'" standard. (Dkt. 31 at 2). The Court disagrees. *See D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) ("[T]he threshold for demonstrating a likelihood of success on the merits is low…In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible."); *Hoban v. Wexford Health Sources, Inc.*, 731 F. App'x 530, 532 (7th Cir. 2018) ("better than negligible" standard applies).

[4] Moss need not show a likelihood of success on all of its claims to obtain a TRO or preliminary injunction. *Girl Scouts of Manitou Council*, 549 F.3d at 1096 (moving party must show it has a better than negligible chance of success on the merits of at least one of its claims).

### a. Trade Secrets

Moss asserts that the Moss Client Spreadsheets qualify as trade secrets because they contain "actual clients with a recent sales history for Moss, as well as sales figures and specific client fulfillment needs." (Dkt. 5 at 3). Under both the ITSA and DTSA, a "trade secret" is defined as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). See also 18 U.S.C. § 1839(3).

Customer lists "can constitute trade secrets where that information is maintained in confidence." *Mickey's Linen v. Fischer*, 2017 U.S. Dist. LEXIS 145513, at *29 (N.D. Ill. Sep. 8, 2017) (citing 765 ILCS 1065/2(d) and collecting cases). This includes lists of actual or potential customers. *Id.*; *see also Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information.") (citation and quotations omitted). In addition, a trade secret "may include a compilation of confidential business and financial information....Courts often look to how easily information can be duplicated without involving substantial time, effort, or expense." *Master Tech Prods. v. Prism*

*Enters.*, 2002 U.S. Dist. LEXIS 5481, at *12 (N.D. Ill. Mar. 26, 2002) (internal quotations and citation omitted).

The information in the Moss Client Spreadsheets is more than just a list of Moss customers. (*see* Jimerson Aff. ¶23). It is a compilation of customer names and corresponding 2018 total revenue, 2019 revenue forecast, revenue by category, description of fabrication or whether local proofing is required, support staff required, and other design and production requirements, as well as some additional detailed comments, by customer. The correspondence between Image Options and the individual defendants further demonstrates the value of the information in the Moss Client Spreadsheets. Bales says that the purpose of requesting this particular information from Scandiff and Fuller was to "evaluate the opportunity of opening a Chicago office" and to "understand an estimate of their respective books of business." (Bales Aff. ¶7). Thus it was the compilation of specific detailed information about Moss's clients in a specific format, as expressly requested by Image Options, that supports Moss's argument that this information was trade secrets.

Defendants argue that all the information was widely-known and publicly available on Moss's website. If that was the case, they do not explain why Image Options did not simply review Moss's website for the information. Instead, Bales created a specific spreadsheet template to gather information from Scandiff and Fuller. Even after receiving the requested information, Bales followed up with additional questions about specific customers.[5] *See SKF USA, Inc. v. Bjerkness*, 636

---

[5] Image Options and the individual defendants both rely on *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003), (Dkt. 31 at 4; Dkt. 36 at 6) but courts in

F. Supp. 2d 696, 714 (N.D. Ill. 2009) ("even if they are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place.").

Moss also made reasonable efforts to maintain the secrecy or confidentiality of the information found in the Moss Client Spreadsheets. In terms of information collected about clients, client projects and potential projects, which Moss says is some of its most valuable information, Moss does not share this type of information with the public or individuals not involved in a client project. (Patterson Aff. ¶¶13–14). Measures to secure its confidential information include requiring all employees to sign confidentiality agreements, notifying employees through the company Employee Handbook of the nondisclosure and confidentiality policy, restricting access to customer information in Salesforce to certain employees requiring access; and instituting log-in and password credentials for system access. (*Id*. ¶15). Moss's services agreements sometimes contain non-disclosure covenants. (*Id*. ¶16). Although Moss has not adopted every conceivable measure to keep its information secret, measures similar to Moss's have been found to be sufficient protections of trade secret information. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1136 (N.D. Ill. 2019); *SKF USA Inc. v. Bjerkness*, 2010 U.S. Dist. LEXIS 80776, at *17 (N.D. Ill. Aug. 9, 2010).

Scandiff and Fuller stress the lack of confidentiality at Moss: They did not observe customer documents marked "confidential", the identification of certain customers on

---

this district have questioned whether *Unisource* remains good law. *See e.g. Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1136 (N.D. Ill. 2019).

the Moss website and services Moss has provided those customers, pricing catalogs that Moss circulates at tradeshows, and the fact that Scandiff and Fuller did not ask Moss customers to sign confidentiality agreements. (see Scandiff Aff. ¶¶10, 15, 16, 20). However, Moss's efforts to protect information need only be "reasonable under the circumstances." 765 ILCS 1065/2(d); see also 18 U.S.C. § 1839(3)(A).

As the Court in *SKF USA, Inc. v. Bjerkness* explained,

> The fact that a company shares information with a customer does not mean the vendor does not attach importance to that information; rather, it reflects a reality of the business environment that some confidential information must sometimes be shared with the client who pays for it without making the necessary effort to arrange a non-disclosure agreement. So long as the information meets the requirements of confidential information…then the information may be treated as confidential regardless of what the customer ultimately does with the information.

636 F. Supp. 2d at 713.

Scandiff and Fuller also argue that the language of the Confidentiality Agreement does not specifically mention "customers" or "clients". (Dkt. 36 at 3). The Court is not convinced that not using those specific terms means that the confidentiality provisions do not cover client information or that Moss cannot prevail on its trade secret misappropriation claims. This is especially so because "[i]t is generally recognized in Illinois that at the termination of employment, an employee may not take with him confidential, particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an

advantage over his competitors." *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987).

At this preliminary stage, Moss has met its burden to show a likelihood that the spreadsheets contained protectable trade secret information and its Confidentiality Agreement covered that information.

### b. Misappropriation

"Misappropriation" is the "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "(B) disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A)-(B). Moss argues that Image Options acquired the Moss Client Spreadsheets from Scandiff and Fuller through "improper means." (Dkt. 5 at 5). In addition, given the lack of evidence at this stage about whether Image Options has actually used any of the trade secret information in its business, Moss also invokes the inevitable disclosure doctrine. (*Id*. at 13–14). "[B]oth the ITSA and DTSA provide that 'threatened' (as well as 'actual') misappropriation may be enjoined." *Mickey's Linen*, 2017 U.S. Dist. LEXIS 145513, at *39. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (Illinois law allows "a court to enjoin the 'inevitable' disclosure of trade secrets.").

Defendants admit to sending and receiving the Moss Client Spreadsheets. (Though they say that they have returned the Moss Client Spreadsheets or are not using any Moss information). Circumstantial evidence also supports Moss's claim of misappropriation. *See Aon Risk Servs*., 2019 U.S. Dist. LEXIS 204402, at *8 (reliance

on circumstantial evidence to prove misappropriation permitted). On January 8, 2020, Fuller sent an email from his personal email address claiming that his "computer crashed" and seeking information from a Moss client. (Jimerson Aff., Exh. 3). In truth he had been fired. A January 14, 2020 email from Fuller states that he is starting a "new venture in partnership" with Image Options. (*Id*. Exh. 2). The documents also show that both Fuller and Scandiff were communicating with outside parties using an Image Options email address in late January, early February 2020. (*Id*. Exh. 4). The documents show Fuller and Scandiff using their personal Gmail accounts, while still employed at Moss, to send emails containing non-public client and project information. Although Image Options insists that it never employed or retained Fuller and Scandiff, and though defendants state that they have returned or are not using any Moss information, "a defendant's bare assurances that he will not misappropriate his former employer's trade secrets may be discounted when he has such a 'history of deceit,' with or without an evidentiary hearing." *Mickey's Linen*, 2017 U.S. Dist. LEXIS 145513, at *43-44. These documents may not present an egregious case of deceit, but at a minimum they give the Court pause about whether the individual defendants actually refrained from using Moss's client information after receiving the Cease and Desist letter on January 8, 2020.

All of this adds up to a sufficient showing of misappropriation, even without a non-compete and non-solicitation clause. *See AMP Inc.*, 823 F.2d at 1202 and *Vendavo*, 397 F. Supp. 3d at 1139-40 ("a former employee may not use the specific, confidential information she gained from a former employer to win clients from her former

employer…[she] has a right to use the skills and generalized industry she gained from her former employer when taking a new job at a competitor, but she may not simply take and use that employer's confidential information in her new position.).

Fuller and Scandiff each state in their affidavits that they provided the information to Image Options based on their experience and "estimates of revenue off the top of my head." (Scandiff Aff. ¶28; Fuller Aff. ¶28). (Dkt. 36 at 6). However the "prohibition against using the trade secrets of one's former employer applies regardless of whether the information is stored in electronic or physical form, or simply resides in one's head." *Vendavo*, 397 F. Supp. 3d at 1139.

In its brief, Image Options argues that the information in the Moss Client Spreadsheets was Fuller's and Scandiff's own "work product." (Dkt. 13 at 6). Image Options relies on *Balmoral Racing Club*, where plaintiffs horse-racing track operators entered into a Co-Branding Agreement ("CBA") with defendant Youbet.com, Inc. *Balmoral Racing Club, Inc. v. Churchill Downs, Inc.*, 2011 U.S. Dist. LEXIS 79275, at *2 (N.D. Ill. July 21, 2011). The customer list constituted Illinois customers who registered with Youbet as anticipated by the CBA. The Court found that under the terms of the CBA, defendant companies did violate any property rights plaintiffs had in the customer list. *Balmoral* involved co-branding agreement between two companies. It did not involve an employer-employee relationship or an employee confidentiality agreement. (And here, there was no agreement between Moss and Image Options). *Balmoral* does not support Image Option's contention that Fuller's

and Scandiff's compilation of Moss client information cannot be the subject of a trade secret misappropriation claim.

Finally, as to damage to Moss, as will be discussed, generally there is a "presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation." *Aon Risk Servs. Cos.*, 2019 U.S. Dist. LEXIS 204402, at *16 (internal quotations and citation omitted). Therefore, Moss has satisfied the "admittedly low" threshold of success on the merits of its trade secrets claims to warrant a TRO and preliminary injunction. *Girl Scouts*, 549 F. 3d at 1096.

### 2. Breach of Contract

Moss contends it is likely to prevail on its breach of contract claims against both Fuller and Scandiff. Under Illinois law, breach of contract requires: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Gonzalzles v. Am. Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 247 Ill. Dec. 881, 887 (2000). Fuller and Scandiff do not dispute that they signed the Confidentiality Agreement. Moss has provided sufficient evidence to support a claim of breach of that agreement based on Fuller's and Scandiff's alleged misappropriation, as discussed.

The Confidentiality Agreement contains only a non-disclosure covenant. In Illinois, "[a] postemployment restrictive covenant will be enforced if its terms are reasonable….To determine the reasonableness of a restrictive covenant, it is necessary to consider whether enforcement of the covenant will injure the public, whether enforcement will cause undue hardship to the promisor and whether the

restraint imposed by the covenant is greater than is necessary to protect the interests of the employer." *Coady v. Harpo, Inc.*, 308 Ill. App. 3d 153, 160-61, 241 Ill. Dec. 383, 389 (1999) (internal citations and quotations omitted). *See also Traffic Tech, Inc. v. Kreiter*, 2015 U.S. Dist. LEXIS 169248, at *65 (N.D. Ill. Dec. 18, 2015) (Illinois courts focus on totality-of-the-circumstances in assessing overall reasonableness of restrictive covenant provision).

The terms of the non-disclosure provision are broad and the timeframe also is broad ("during the term of their employment or any time thereafter"). But, "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved." *Coady*, 308 Ill. App. 3d 153, 161. *See also Traffic Tech, Inc.*, 2015 U.S. Dist. LEXIS 169248, at *67 (finding plaintiff had likelihood of success on breach of contract claim based on a restrictive covenant).

In their brief, Fuller and Scandiff did not address the breach of contract claim. (Dkt. 36). At this stage, the Court finds that Moss has a likelihood of success on its breach of contract claims against the individual defendants.

### 3. Breach of fiduciary duty and inducement to breach of duty of loyalty

Moss contends that it is likely to prevail on its claims for breach of the duty of loyalty against Fuller and Scandiff and inducing a breach of fiduciary duty against Image Options. However Moss has not provided evidence that Image Options was aware of the Confidentiality Agreement or Employee Handbook provisions. And Image Options maintains that it was not aware of any contract that Fuller or Scandiff

had entered into with Moss. (Bales Aff.). Therefore the Court finds that Moss has not shown a likelihood of success on its inducement claim against Image Options.

On the other hand, Moss has shown a likelihood of success on its breach of fiduciary duty claim against the individual defendants. "[E]mployees, as agents of their employer, do not fall outside the purview of a breach of fiduciary duties." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). As the Seventh Circuit explained in *Foodcomm*, "[employees'] efforts to actively exploit their positions within Foodcomm for their own personal benefits, and to hinder Foodcomm's ability to conduct its business with Empire, if proved at trial, constitute a breach of fiduciary duty." *Id*. at 304. The evidence shows Moss has a sufficient likelihood of success in being able to show Fuller and Scandiff were exploiting their positions at Moss for their personal benefit and the benefit of Image Options in violation of their fiduciary duties.

### B. Irreparable Harm and Remedy at Law

A plaintiff must show it is "*likely* to suffer irreparable harm without the injunction." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 780 (N.D. Ill. 2011) (emphasis in original). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm*, 328 F.3d at 304.[6]

Because the breach of contract and fiduciary duty claims are based on alleged misappropriation, the harm analysis for all three claims converges. Moss argues that

---

[6] These elements, irreparable harm and inadequate remedy at law, are often considered together. *See id*.

marketplace loss is intangible and cannot be computed in damages. Indeed intangible harms can include loss of a competitive position and losing customers. *See Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"); *see also Mickey's Linen*, 2017 U.S. Dist. LEXIS 145513, at *61. Given Bales' admission that Image Options was intending to set up a Chicago office and sought information from the individual defendants specifically to evaluate that possibility and the "potential portable business" (Bales Aff. ¶7), this is additional evidence that irreparable harm is likely.

Furthermore, generally in trade secrets cases, "there is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation." *Aon Risk Servs. Cos.*, 2019 U.S. Dist. LEXIS 204402, at *16 (internal quotations and citation omitted). Moreover, the Confidentiality Agreement signed by the individual defendants expressly anticipates the need for injunctive relief: "Employee acknowledges and agrees that any unauthorized disclosure or use of information…will damage, diminish, and irreparably harm Moss Inc. such that there will not be an adequate remedy at law." (Am. Compl. Exh. B).

The Court concludes that Moss has satisfied its burden to show irreparable harm and inadequate remedy at law.

### C. Balance of Harms

Although Moss passes threshold test for showing a need for injunctive relief, there are factors that caution against broad relief, including the lack of a non-compete or

non-solicitation provision, the fact that Moss has not pointed to any specific client that has left Moss for Image Options and defendants' insistence that Fuller and Scandiff are not working for Image Options. But the balance still favors Moss considering the preliminary evidence to date. *See Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 U.S. Dist. LEXIS 54119, at *16 (N.D. Ill. July 16, 2008) (finding balance of harms favored injunctive relief because "[g]ranting the requested relief to that extent only would prohibit Neergheen from using material that it appears he should not have taken in the first place.").

On the other hand, the Court is mindful of the competitive and commission-based business that Fuller and Scandiff have been working in and intend to continue in, and takes seriously their representations in their affidavits about the nature of and need for their work. The Court will not prevent Fuller and Scandiff from working at Image Options or any other employer of their choice. Therefore a limited injunction is warranted. *See Vendavo*, 397 F. Supp. 3d at 1141, 1144 (prohibiting employee from working on any client that she previously worked with while she worked for plaintiff company but she was "certainly allowed to compete against Plaintiff given the absence of a non-compete in her agreement").[7]

### D. Injunction

The Court will enter a TRO and preliminary injunction order as follows:

 (1) From now until trial, Defendants Image Options Inc., Cullen Fuller and Daniel Scandiff are enjoined from (a) continuing to retain, possess, or use (including through electronically stored media) the business,

---

[7] In light of the facts in this case and considering the balance of harms, the Court is not convinced by Moss's argument that an injunction should extend to prohibiting Defendants from calling on suppliers.

financial, client, supplier, and other non-public information that originated from Moss or that Fuller and Scandiff developed or received relating to Moss's business during their Moss employment; and (b) disclosing to any third-party this same information.

(2) From now until October 1, 2020, Cullen Fuller and Daniel Scandiff are enjoined from soliciting, servicing, conducting business, or calling upon those Moss clients identified in the Moss Client Spreadsheets with the purpose of competing with Moss.

### E. Bond

Rule 65 "makes security mandatory…but also anticipates the exercise of discretion in determining the amount of the bond to be posted." *Gateway E. Ry. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1141 (7th Cir. 1994). "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 956 (N.D. Ill. 2007). "Setting the amount of security too low may produce irreparable injury because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id*. Moss requests a bond amount of $1,000. (Dkt. 2 at 4). This is too low and not on par with the bond amounts in other trade secret cases. *See e.g. Mickey's Linen*, 2017 U.S. Dist. LEXIS 145513, at *67 (requiring plaintiff to post a $25,000 bond); *Vendavo*, 397 F. Supp. 3d at 1147 (setting total bond at $100,000).

Considering the purpose of the injunction bond and the nature of the injunction the Court is entering, the Court will require a $25,000 bond.

### F. Motion for Expedited Discovery

In light of this ruling granting a partial TRO and preliminary injunction, there is no need for expedited discovery and Moss's motion for expedited discovery [3] is denied.[8]

### CONCLUSION

For the stated reasons stated, Moss's motion [2] is granted in part and denied in part and its motion for expedited discovery is [3] denied. The Court grants a partial temporary restraining order and preliminary injunction against Defendants. Separate TRO and preliminary injunction order to follow. Defendants shall answer Moss's amended complaint by April 3, 2020. Status hearing is set for April 16, 2020 at 9:00am. Parties should be prepared to discuss discovery. This case is subject to the Mandatory Initial Discovery Program (MIDP) and parties must comply with the MIDP standing order. Parties should also be prepared to discuss whether a settlement conference would be productive.

E N T E R :

Dated: March 6, 2020

_Mary M Rowland_
_____
MARY M. ROWLAND
United States District Judge

---

[8] The Court also does not need a hearing on the preliminary injunction. Such a hearing is not always required. *See Ty, Inc., Inc.*, 132 F.3d at 1171; *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002). The Court does not believe there are genuine issues of material fact requiring an evidentiary hearing. The Court has sufficient evidence from the sworn affidavits, briefs, and documents submitted by all parties to rule on the pending motion without an evidentiary hearing.